812 F.2d 655
 38 Ed. Law Rep. 47
 David M. NASH and Donna C. Perry, Plaintiffs-Appellants,
v.
AUBURN UNIVERSITY, Frank G. Vice, J.T. Vaughan, H.C. Morgan
and James E. Martin, individually and in their
official capacities, Defendants-Appellees.
 No. 85-7675.
 United States Court of Appeals,
Eleventh Circuit.
 March 16, 1987.
 
 1
 McPhillips, DeBardelaben & Hawthorne, Julian McPhillips, Griffin Sikes, Montgomery, Ala., for plaintiffs-appellants.
 
 
 2
 David R. Boyd, Balch & Bingham, Montgomery, Ala., Thomas D. Samford, III, Samford & Samford, Opelika, Ala., Joseph C. Espy, III, Melton & Espy, P.C., Montgomery, Ala., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Middle District of Alabama.
 
 
 4
 Before RONEY, Chief Judge, CLARK, Circuit Judge, and DOYLE*, Senior District Judge.
 
 JAMES E. DOYLE, Senior District Judge:
 
 5
 Appellants Nash and Perry seek injunctive relief and damages under 42 U.S.C. Sec. 1983 for constitutional violations in their suspension from the Auburn University School of Veterinary Medicine on a charge of academic dishonesty. They brought this action on September 20, 1985, also alleging a pendent state law claim for breach of contract by wrongful suspension. After a hearing on September 25, appellants were granted a temporary restraining order, under which they were allowed to audit classes and to take the tests required of other students enrolled in the School of Veterinary Medicine. On October 18, 1985, the district judge conducted a hearing on appellants' motion for preliminary injunction, consolidated with a trial on the merits. On cross motions for summary judgment, the court granted summary judgment in favor of appellees. Nash v. Auburn University, 621 F.Supp. 948 (M.D.Ala.1985). The court later denied appellants' motion for an injunction pending appeal. Appellants ask us to reverse the district court's grant of summary judgment to appellees.
 
 
 6
 On appeal, Nash and Perry make two arguments: that appellees engaged in constitutionally inadequate procedures which violated appellants' rights under the due process clause of the fourteenth amendment; and that the decision to suspend them was made without sufficient evidentiary support, in violation of their substantive due process rights under the fourteenth amendment.
 
 I.
 
 7
 Pursuant to 28 U.S.C. Sec. 1291, this court has jurisdiction over this appeal, as the district court's grant of summary judgment to appellees is a final judgment. Burkett v. Shell Oil Co., 487 F.2d 1308, 1314 (5th Cir.1973).[1] In our review we apply independently the standard a district court must apply to determine the appropriateness of summary judgment. East Park, Inc. v. Federal Insurance Co., 794 F.2d 616, 618 (11th Cir.1986). We have conducted an independent review of the record and have found that the appellees satisfactorily demonstrated to the district court that no genuine dispute exists as to any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); East Park, 794 F.2d at 618. Any factual inferences drawn from the evidence are viewed in the light most favorable to appellants, the non-moving party. Adickes, 398 U.S. at 157, 90 S.Ct. at 1608; East Park, 794 F.2d at 618. Likewise, any reasonable doubt about the facts is resolved in favor of the non-moving party. East Park, 794 F.2d at 618.
 
 A. Facts Relating to the Procedures
 
 8
 Appellants were first-year students at the Auburn University School of Veterinary Medicine when the events occurred that form the basis of the claims in this lawsuit.
 
 1. The notice
 
 9
 Appellants were advised in writing on June 6, 1985, that they were charged with a violation of the Student Code of Professional Ethics (the code) of the Auburn University School of Veterinary Medicine. By such notice they were given "at least 72 hours to prepare a defense for the charge of academic dishonesty, in that while taking examinations during 1984-1985 school year, information was allegedly obtained in an unethical manner." A hearing was scheduled for June 10, 1985, before the Student Board of Ethical Relations (the board).
 
 
 10
 Appellants appeared with counsel at the June 10 hearing. Counsel objected that the June 6 notice was inadequate and too general to advise the appellants of the charge against them. He requested a more specific notice and one additional day to prepare their defense. Appellants consulted with counsel and they agreed to receive a restated charge the following day, with a hearing set for June 12, 1985. The following colloquy took place between appellants' attorney and the student chancellor of the board after the chancellor had taken a recess to seek advice from school officials:
 
 
 11
 Chancellor: In view of the request by [plaintiffs' attorney] Mr. Meadows to have more of an opportunity and more time for consideration of specific charges and in view of the fact that specific charges were not stated in the letter and after review and counsel from Dr. Morgan and Dean Vaughan, it is ... decided that at least 48 hours shall be enough time, and 48 hours, if the accused and attorney ... feel that that's necessary. I ask them now if 48 hours is sufficient time?
 
 
 12
 Plaintiffs Attorney: ... Mr. Vice, let me just ask. Am I to understand that we're having 48 hours from tonight with specific charges?
 
 
 13
 ... If so, when will those charges be forthcoming?
 
 
 14
 Chancellor: [T]he specific charges can be given to you tomorrow, June 11, 1985. The dean's office by 1:00. They will be in writing, typed form, and those will be the charges that you all will have to address. And the time for the hearing, if it's agreeable, and probably not agreeable ... the best possible time that I think that the next hearing should take place would be June 12, 1985, 6:45, 7:00 Wednesday night. Is that sufficient time?
 
 
 15
 Plaintiffs Attorney: That's fine with me. Can I take just a moment more to ask them? (MEADOWS CONSULTED WITH NASH AND PERRY.)
 
 
 16
 [T]hat's fine with us. 48 hours from tonight, which will be Wednesday night, June 12, at 6:45, here. That's fine. We'll be here.
 
 
 17
 Chancellor: [S]ince the justices and accused are in agreement, are the witnesses also in agreement to that time? The nods are in agreement that Wednesday night will [sic] ... June 12, 1985, 7:00, in the Pathology Department. So, with that, we'll adjourn until Wednesday night, 7:00.
 
 
 18
 Defendants' Exhibit 28 at 9.
 
 
 19
 The following day each appellant received a written memorandum, dated June 11, 1985, advising them that they were charged with a violation of the code in "giving or receiving [a]ssistance or communication between students during the [a]natomy examination given on or about May 16, 1985." Included in the memorandum was a list of students and anatomy faculty witnesses who were expected to testify at the hearing in support of the charge against appellants.
 
 2. The hearing
 
 20
 A disciplinary hearing before the board was held on June 12, 1985. Both Nash and Perry attended, in the company of their attorney. The hearing was conducted by the non-voting student chancellor of the board, in the presence of appellants, witnesses and student justices. There was no attorney for the board present. The chancellor allowed appellants' counsel to advise his clients during the hearing, but he was not permitted to participate in the proceedings. Appellants were to be allowed to question the adverse witnesses by directing their questions to the chancellor, who would then pose their questions of the witnesses.
 
 
 21
 The June 12 hearing opened with statements by the witnesses in support of the charge against appellants. The witnesses also answered questions from the justices and appellants objected to the limited method of cross-examination allowed them. After all of the testimony was presented supporting the charge, appellants were granted a short recess and then given an opportunity to present their defense. Appellants were allowed to present statements responding to the charge against them and rebutting the testimony of the student and faculty witnesses. They brought witnesses in their behalf who also made statements to the board and answered questions of the justices. After all of the presentations, the board again questioned appellants and the witnesses.
 
 
 22
 After the board completed its questioning, appellants were given the opportunity to question the opposing witnesses by submitting questions to the chancellor, who would then direct the questions to the witnesses. Appellants instead asked the board several questions. Appellants asked for a recess, which was denied by the chancellor, and the hearing was concluded.
 
 
 23
 After deliberating in private, the board decided unanimously that appellants were guilty of the charge of academic dishonesty. The justices recommended that appellants be suspended from school, with the opportunity to apply for admission again in one year. Appellants were notified of the board's decision and recommendation.
 
 3. Nature of the tribunal
 
 24
 In May, 1985 an undergraduate student at Auburn University was caught with a crib sheet during an examination, confessed to having cheated, and was suspended from school by an honor court. The university president reduced the sanction, and was publicly criticized by the Auburn chapter of the Association of University Professors and by the Auburn University student senate. In fact, the chair and seven members of the Auburn University Honor Committee resigned to protest the action of the university president. The episode in May was "emotionally charged," and concern over academic dishonesty persisted in the minds of many Auburn students and faculty members during June, 1985. There was no reference to the May incident at the board's June 10 or June 12 hearings on the charge against appellants.
 
 
 25
 One student justice, who sat on the board to hear the charge against appellants, knew about the suspicions surrounding appellants' conduct, but he had no specific, prior knowledge of any violations of the code occurring at the May 16 anatomy examination. He had contact with some potential student witnesses before the hearing to inform them of the procedure for reporting violations of the code. If a student knew of any violations of the honor code, he or she was to report them to the non-voting chancellor of the board.
 
 
 26
 Anatomy faculty members and five student witnesses testified at the June 12 hearing that they observed appellants examining specimens together in laboratory examinations and moving together from question to question at those exams. At the lab exams, appellants were often seen suspiciously to signal each other and to exchange glances; on other exams they were seen to look on each others' papers. Appellants frequently sat together at written exams in seats not assigned to them at the rear of the exam rooms. Two anatomy professors separately warned David Nash that his conduct at exams, other than the May 16 neuroanatomy exam, was suspicious. But after the warnings, appellants were seen to conduct themselves as before. Appellants objected to the testimony extraneous to their conduct or performance on the May 16 exam.
 
 4. The appeal
 
 27
 Appellants were notified of their right under the code to appeal the board's decision to the dean of the School of Veterinary Medicine; they appealed to the dean on June 13, 1985. Pursuant to the code, the dean referred the case to the school's faculty Committee on Admissions and Standards for its review and recommendation. On June 19, 1985, the committee held a day-long meeting to consider the appeal. The committee reviewed a copy of the materials presented to the board at its June 12 hearing and listened to an audio recording of the June 12 hearing. Appellants presented oral and written statements in their defense and answered questions from the committee. After deliberating, the committee voted unanimously to recommend that the dean uphold the board's findings and recommendation. The dean accepted the committee's recommendation and upheld the action of the board.
 
 
 28
 Appellants later appealed to the president of Auburn University, who reviewed the written file in the case and concurred in their suspension.
 
 B. Facts Relating to the May 16 Exam
 
 29
 Five members of the anatomy and histology faculty at the Auburn University School of Veterinary Medicine appeared at the June 12 hearing to accuse appellants of academic dishonesty at the May 16 neuroanatomy exam. In addition, five student witnesses testified as to their observations of appellants' behavior at the May 16 neuroanatomy examination.
 
 
 30
 Appellants sat close together, out of their assigned seats, at the exam in question. One of their classmates noticed during the exam that Donna Perry had finished writing an answer and was holding up her paper as if to review it. The student became suspicious when he saw that David Nash was working on the same page of his exam that Donna Perry appeared to be holding up to review. Another student sat behind appellants and saw them looking on each others' papers during the exam.
 
 
 31
 The May 16 exam was monitored by the five anatomy faculty witnesses who noticed the close contact of appellants. Some professors observed Nash often sitting with his elbow on the table, his head propped in his hand, and his gaze directly on Perry's paper.
 
 
 32
 Anatomy professor Donald Buxton prepared the May 16 neuroanatomy exam. Upon grading the May 16 exam papers, he found a similarity in appellants' answers to six of twenty-eight questions. Buxton compared and analyzed appellants' answers and, with his observations of appellants' suspicious behavior at the exam, he became convinced that they had cheated. Given Buxton's analysis, their own study of the exam answers, and their own observations of appellants' conduct at the May 16 exam, the other anatomy faculty witnesses concluded also that it was unlikely appellants' answers would be so similar unless there had been collusion between them.
 
 
 33
 Harley E. McKean, a statistician from the University of Kentucky, studied appellants' May 16 examinations and testified before the district court on October 18, 1985. (Record 3 at 31-45) It is his opinion that the similarity of six of appellants' answers on the May 16 neuroanatomy exam does not give rise to a conclusion that appellants cheated. He explains the similarity in their answers by the close collaboration by appellants during the school year and, especially, by their extensive study together from the same notes for the May 16 exam. McKean had no knowledge of veterinary medicine or neuroanatomy at the time of his testimony.
 
 II.
 
 34
 Under the Fourteenth Amendment to the United States Constitution, no state may "deprive any person of life, liberty, or property, without due process of law...."
 
 
 35
 It is alleged and not disputed that Auburn University is a creature of the state of Alabama. Although the district court made no finding regarding the public nature of Auburn University, we will proceed on the basis that it is a state supported institution. Further, it is assumed by the parties and by the district court that appellants have property and liberty interests in their continued enrollment at Auburn University and that their interests enjoy the protections of due process. We will proceed to decide this appeal, making the same assumption, without expressing an opinion on the point.
 
 A. The Procedural Due Process Claims
 
 36
 "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citation omitted). What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances. Id. at 334, 96 S.Ct. at 902; Goss v. Lopez, 419 U.S. 565, 577-78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). That flexible standard was translated by the Goss court to mean that high school students facing the deprivation of a property right by suspension from school must, at a minimum, "be given some kind of notice and afforded some kind of hearing." 419 U.S. at 579, 95 S.Ct. at 738 (emphasis in original). In Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), we broadly defined the notice and hearing required in cases of student expulsion from college: "[A]n opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required." Id. at 159.
 
 
 37
 The adequacy of the notice and the nature of the hearing vary according to an "appropriate accommodation of the competing interests involved." Goss v. Lopez, 419 U.S. at 579, 95 S.Ct. at 739. Under Mathews, three factors are important when considering the constitutional adequacy of the procedures afforded in a given situation:
 
 
 38
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 39
 424 U.S. at 335, 96 S.Ct. at 903 (citation omitted). The due process clause is not a "shield ... from suspensions properly imposed," nor does it ensure that the academic disciplinary process is a "totally accurate, unerring process"; it merely guards against the risk of unfair suspension "if that may be done without prohibitive cost or interference with the educational process." Goss v. Lopez, 419 U.S. at 579-80, 95 S.Ct. at 738-39.
 
 
 40
 Nash and Perry argue that appellees engaged in procedures which deprived them of constitutionally protectible rights in their continued enrollment as veterinary students. They argue that inadequate notice failed to provide them the opportunity for a meaningful response to the charge of academic dishonesty. Specifically, they claim that the interval of time between the notice and the hearing was too short, and the notice did not apprise them of the substance of the evidence against them. They argue also that the June 12 hearing was inadequate to protect their interests from erroneous deprivation in that they were denied the opportunity to cross-examine witnesses and they were unfairly denied a recess. Further, they argue that the tribunal was unfairly prejudiced by the existence of a contemporaneous undergraduate honor code controversy at Auburn University, by the admission of irrelevant testimony, and by the participation of a justice with knowledge of the charge. Appellants argue also that they were denied a meaningful appeal and that the cumulative effect of these individual abridgments of their rights denied them due process of law.
 
 
 41
 Appellants suggest that an analysis of the procedures afforded them, pursuant to Mathews and Goss, should take into account three factors which are fundamental to the nature of their protectible interests: the high level of achievement that they have reached as first-year graduate students in a professional program; the severity of the charge of academic dishonesty; and the severity of the sanction.
 
 1. The notice
 
 42
 a. Timing
 
 
 43
 There are no hard and fast rules by which to measure meaningful notice. "An elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978) (quoting Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). Appellants argue that receiving the restated notice only one day before the June 12 hearing effectively denied them a meaningful opportunity to be heard. They rely on due process analysis in other contexts to point out the insufficiency of one day's notice. See Goldberg v. Kelly, 397 U.S. 254, 268, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) (fairness in some cases may require more than seven days' notice of the termination of welfare benefits); Walker v. U.S., 744 F.2d 67, 70 (10th Cir.1984) (five days' notice to a public employee insufficient pre-termination notice); Wagner v. Little Rock School District, 373 F.Supp. 876 (E.D.Ark.1974) (one day inadequate to notify a school teacher of her termination hearing).
 
 
 44
 The parties do not dispute that the June 6 memorandum gave notice of a hearing scheduled four days later, in accordance with the seventy-two hour code requirement. Nor do they dispute that the June 11 notice preceded the rescheduled hearing by one day. Further, the record clearly discloses that appellants, with the advice of their attorney, agreed to the timing of the restated notice and the rescheduled hearing. They made no objections to the timing of the notice and hearing, nor did they request a delay in the schedule between the promised, restated notice and the June 12 hearing. We agree with the district court that by appellants' express agreement to the timing of the notice, as proposed by the board, appellants have waived objections in this forum to any constitutional infirmity in the timing. Their agreement constitutes acquiescence to the timing of the notice and hearing. See Stewart v. Bailey, 556 F.2d 281, 285-86 (5th Cir.1977) (knowing waiver of the right to a hearing); Bignall v. North Idaho College, 538 F.2d 243, 246-47 (9th Cir.1976) (knowing waiver of a complete hearing); Yench v. Stockmar, 483 F.2d 820, 822-23 (10th Cir.1973) (acquiescence to procedure by silence of over one year).
 
 
 45
 Appellants urge here, however, that a coercive atmosphere pervaded the June 10 hearing, providing appellants and their counsel no choice but to agree to the board's proposed timing of the restated notice and the rescheduled hearing. However, in the record of the June 10 hearing we find no evidence of coercion to give us concern that appellants' waiver might not have been knowingly given. Appellants' counsel made objections and asked questions freely of the board chancellor regarding the scheduling and the content of the notice; counsel and appellants consulted without apparent interruption before agreeing to the board's proposed schedule; and counsel explicitly agreed to receive the restated notice by 1:00 p.m. on June 11 and to a hearing scheduled on the evening of June 12.
 
 
 46
 Appellants argue here, also, that their agreement to the timing of the restated notice and hearing was given on the basis of the vague charges stated in the June 10 notice and on an agreement that they would be provided copies of complaining letters from the student witnesses. They argue that their agreement was not based on knowledge that the June 11 notice would include faculty members as their accusers. However, had appellants not acquiesced in the timing and rescheduling, we would nevertheless find no constitutional infirmity in the timing of the notice. In sum, appellants were given four days by the June 6 notice and an additional one day by the June 11 notice, for a total of about six days from the June 6 notice to prepare their defense at the June 12 hearing. Despite the severity of the charge of academic dishonesty and the severe sanction it carries, the time allowed appellants was reasonable. It enabled them to retain counsel who successfully argued in their behalf at the June 10 hearing for a more specific notice of the charge as well as for a delayed hearing. Further, appellants had sufficient time to appear at the June 12 hearing with witnesses in their behalf, bringing documentation to support their defense. At no time during the June 12 hearing did they object to the timing of the notice and hearing, nor did they request more time to prepare their defense.
 
 
 47
 b. Content
 
 
 48
 Under Goss v. Lopez, constitutionally adequate notice merely provides "rudimentary precautions" for high school students facing short-term suspension for disciplinary reasons; it must inform the students of the accusations against them. 419 U.S. at 581-82, 95 S.Ct. at 739-40. The notice, along with a hearing, the nature of which conforms to the varying needs of the circumstances, "provide[s] a meaningful hedge against erroneous action." Id. at 583, 95 S.Ct. at 741.
 
 
 49
 Appellants argue that the notice in this case was deficient because it did not advise them of the nature of the testimony to be presented against them or of the facts underlying the charge of academic dishonesty. To support their argument, appellants rely on Dixon v. Alabama State Board of Education, 294 F.2d at 158-59, and Keough v. Tate County Board of Education, 748 F.2d 1077, 1081-82 (5th Cir.1984) for the proposition that students facing a suspension hearing for misconduct must be given notice of the substance of the evidence to be presented against them. Appellants urge that the analysis by Professor Buxton of their May 16 examination answers was persuasive, complex testimony and came as a surprise. They argue that they were entitled to a summary of the testimony expected from Buxton and the other accusing witnesses at the June 12 hearing, because only such notice would have provided safeguards against their surprise at the testimony and would have ensured them a fair opportunity to respond. Had they known of Buxton's analysis before he testified, appellants suggest they would have presented expert, statistical testimony to rebut the inference that they cheated on the May 16 neuroanatomy exam.
 
 
 50
 As the district court below accurately pointed out, we did not require in Dixon that students facing a hearing on charges of misconduct be given the names of witnesses against them and a summary of their expected testimony, when the opposing witnesses will testify in the presence of the accused. In Dixon we suggested that the notice should provide "a statement of the specific charges and grounds which, if proven, would justify expulsion." 294 F.2d at 158. However, the Dixon university students were not present to hear the evidence against them. We held that under these circumstances they should be given the names of the accusing witnesses and a report of their testimony, to ensure the students' ability to respond at a later forum. Id. at 155, 159. Dixon is distinguishable from the instant case because appellants were present at their hearing and were able to confront the university's witnesses.
 
 
 51
 Nor did the Fifth Circuit require in Keough a more extensive notice to safeguard the rights of students facing long-term suspension from high school. 748 F.2d at 1081. Although the plaintiff in Keough received a copy of the witnesses' statements before the school board hearing at which he also appeared and at which the decision to suspend was made, the court did not take that opportunity to require for all school discipline cases the more extensive notice that appellants seek here. Id. at 1082. Given the flexible requirements of due process, the court cautioned in Keough that "the standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Id. at 1081-82 (quoting Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir.1970)).
 
 
 52
 There is no constitutional requirement that, to provide them an opportunity to respond, appellants must have received any more in the way of notice than a statement of the charge against them. Although the June 6 notice in their case was rudimentary, the June 11 notice specified that appellants were accused of academic dishonesty on the May 16 neuroanatomy exam and it included a list of accusing witnesses. On that notice, appellants obtained the assistance of counsel and brought to the June 12 hearing students and a faculty witness who testified as to their own interpretations of appellants' conduct throughout the school year and at the May 16 exam. Appellants were present at the entire June 12 hearing to hear the evidence against them, made a cogent defense, and undertook to discredit the adverse testimony, including Professor Buxton's analysis of their exam answers.
 
 
 53
 Despite the serious charge against appellants, who were hard-working students on the threshold of their careers, and the severity of the sanction imposed on them, we find that appellants were afforded constitutionally adequate notice and were adequately prepared by the notice to defend the charge against them. We agree with the district court that in this academic disciplinary process appellants were not constitutionally entitled to advance notice of statements by witnesses who, along with the appellants, were to appear at the hearing.
 
 2. The hearing
 
 54
 a. Right to cross-examination
 
 
 55
 "The fundamental requisite of due process of law is the opportunity to be heard." Goss v. Lopez, 419 U.S. at 579, 95 S.Ct. at 738 (quoting Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914)). However, the nature of the hearing "will depend on appropriate accommodation of the competing interests involved." Id.; Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).
 
 
 56
 Appellants rely on Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) to challenge the constitutional adequacy of their hearing on the ground they were not allowed to cross-examine the accusing witnesses. Goldberg taught us that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Id. at 269, 90 S.Ct. at 1021. However, we have not expanded the Goldberg procedural requirements for quasi-judicial termination of welfare benefits in student disciplinary hearings. Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding. Boykins v. Fairfield Board of Education, 492 F.2d 697, 701 (5th Cir.1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975); Dixon v. Alabama State Board of Education, 294 F.2d at 159; accord, Blanton v. State Univ. of New York, 489 F.2d 377, 385 (2d Cir.1973); Jaska v. Regents of the Univ. of Mich., 597 F.Supp. 1245, 1252-53 (E.D.Mich.1984), aff'd., 787 F.2d 590 (6th Cir.1986); but see, Dillon v. Pulaski County Special School District, 594 F.2d 699, 700 (8th Cir.1979) (Benson, J., concurring) (to resolve disputed issue of fact, high school student should have been allowed to cross-examine his accuser, who did not testify at the expulsion hearing); Winnick v. Manning, 460 F.2d 545, 549-50 (2d Cir.1972) (cross-examination of witnesses might be essential to a fair hearing if credibility is at issue in the suspension of a university student).
 
 
 57
 Due process requires that appellants have the right to respond, but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial. Goss v. Lopez, 419 U.S. at 583, 95 S.Ct. at 740; Jenkins v. Louisiana State Board of Education, 506 F.2d 992, 1000 (5th Cir.1975); see, Henson v. Honor Committee of the Univ. of Va., 719 F.2d 69, 74 (4th Cir.1983); accord, Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 88-90, 98 S.Ct. 948, 954-55, 55 L.Ed.2d 124 (1978).
 
 
 58
 Although appellants were not allowed to ask questions directly of the adverse witnesses at the June 12 hearing, it is clear that they heard all of the testimony against them. Appellants were told they could pose questions of the accusing witnesses by directing their questions to the presiding board chancellor, who would then direct appellants' questions to the witnesses. Appellants were clearly informed when the time came for them to ask questions in the prescribed manner. That they did not avail themselves of the opportunity to question the witnesses through the chancellor cannot be characterized as a denial of process. Following the testimony by the accusing witnesses and a recess that appellants requested, appellants presented statements and witnesses in their behalf, the testimony of whom, if given credence by the board, was itself capable of challenging the inferences suggested by the testimony of the accusing witnesses.
 
 
 59
 We do not suggest that the opportunity to question witnesses would not have been valuable in this case. Such a process would be more important in a disciplinary action such as the present case than, for example, in the case of a student's dismissal for deficient academic performance, where the proof is found in facts objectively discerned and not on inference from personal observations. However, we agree with the district court here that, because of the procedures afforded appellants, there is little risk that the June 12 hearing insufficiently protected the rights of appellants. Although an important notion in our concept of justice is the cross-examination of witnesses, there was no denial of appellants' constitutional rights to due process by their inability to question the adverse witnesses in the usual, adversarial manner.
 
 
 60
 b. The recess
 
 
 61
 Appellants contend here that their constitutional right to a meaningful opportunity to respond to the charge against them encompasses a right to a recess during the time provided for their questions of the adverse witnesses and immediately before the hearing was concluded. Appellants suggest that the denial of their request for this recess effectively denied them the opportunity to exercise their limited cross-examination rights. We do not agree. We concur with the district judge who, at the October 18, 1985 hearing, commented that
 
 
 62
 they were given the opportunity, they did ask some questions, they asked for a recess and they weren't granted a recess.... I am not saying it was all fine, but when you say they weren't given any opportunity, they were given an opportunity, they did ask some questions. They asked for a recess, and whether it was wise to deny it or not, I am not going to say, but to say they weren't given any opportunity simply isn't the way I read the transcript.
 
 
 63
 Record 3 at 85. Appellants had been informed of the procedure for their examination of the adverse witnesses and they were granted a recess earlier, prior to presenting their defense. To deny the last request for a recess, as the chancellor did, was within his discretion as the presiding justice and it did not result in a violation of appellants' rights.
 
 3. Fairness of the tribunal
 
 64
 An impartial decision-maker is an essential guarantee of due process. Withrow v. Larkin, 421 U.S. 35, 46-47, 95 S.Ct. 1456, 1463-1465, 43 L.Ed.2d 712 (1975). "[B]asic fairness and integrity of the fact-finding process are the guiding stars." Boykins v. Fairfield Board of Education, 492 F.2d at 701. Appellants argue that the board was unfairly prejudiced at the June 12 hearing by three circumstances: a contemporaneous controversy over the discipline of an Auburn undergraduate; the admission of prejudicial testimony regarding appellants' conduct at times other than on the May 16 neuroanatomy exam; and the failure of a student justice to recuse himself.
 
 
 65
 a. The contemporaneous controversy at Auburn
 
 
 66
 Appellants argue that because of the existence of a contemporaneous controversy involving Auburn undergraduates and the university president, who reduced the sanction of one student found to have cheated on an exam with a crib sheet, the tribunal deciding their case was unfairly prejudiced. They argue that an emotionally charged atmosphere over academic dishonesty persisted on the Auburn campus in June 1985 and compromised the possibility that the board would be impartial in their case.
 
 
 67
 We may not, however, infer that the board was biased against appellants. Any alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation or inference. Levitt v. University of Texas, 759 F.2d 1224, 1228 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985); Jenkins v. Louisiana State Board of Education, 506 F.2d at 1003; Duke v. North Texas State University, 469 F.2d 829, 834 (5th Cir.1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973). There was no reference at the June 10 or June 12 hearings to the May 1985 undergraduate cheating controversy, nor is there any suggestion from the record that the justices had made any decision, prior to the June 12 hearing, regarding the nature of the charge against appellants or the culpability of appellants. We agree with the district court that there is no evidence raising an inference that the hearing was unfairly prejudiced by the May 1985 undergraduate honor code controversy.
 
 
 68
 b. The testimony about appellants' general conduct
 
 
 69
 Appellants argue further that they were denied an impartial tribunal because the board heard prejudicial testimony, concerning appellants' conduct at exams other than the May 16 exam, which was not relevant to the charge of academic dishonesty on the May 16 neuroanatomy examination.
 
 
 70
 Although remaining fair to the accused, student disciplinary hearings follow flexible rules and need not conform to formal rules of evidence. Boykins v. Fairfield Board of Education, 492 F.2d at 701. We agree with the district court in this case that if the federal rules of evidence governed such hearings, evidence of appellants' conduct at exams other than the May 16 exam would be admissible under Fed.R.Evid. 404(b) for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See Phillips v. Smalley Maintenance Services, Inc., 711 F.2d 1524, 1532 (11th Cir.1983) (evidence that another employee had been subjected to treatment similar to that of appellants properly admitted under rule 404(b)). If the June 12 hearing had been held before a tribunal governed by the federal rules of evidence, testimony relating to appellants' conduct at other exams would be relevant if, despite the potentially prejudicial nature of the evidence, the tribunal could draw similar inferences from it regarding the similarity of appellants' conduct at the May 16 exam.
 
 
 71
 c. The student justice
 
 
 72
 Appellants argue that the active presence of one student justice unfairly prejudiced the June 12 hearing and the deliberations of the board in this case, because that justice had prior knowledge of the charge of academic misconduct against appellants. They argue that a fair hearing and an unbiased decision were not possible in their case because the justice had not recused himself.
 
 
 73
 There is no evidence in the record, however, which suggests bias on the part of the student justice in question, such that he should disqualify himself from performing his duties on the board. He was familiar with appellants' conduct and with the general comments made about them by their classmates. In his contact with some potential student witnesses prior to the June 12 hearing, he explained the method of bringing information about violations of the code before the board chancellor. Those conversations were not part of an inquiry into the incident forming the basis for the charge against appellants, nor do they reveal that he performed his duties as a justice having formed an opinion regarding the charge against appellants.
 
 
 74
 In Duke we refused "to establish a per se rule that would disqualify administrative hearing bodies ... solely for the reason that ... some of [the members] participated in the initial investigation of the incident and initiation of the cause under consideration." 469 F.2d at 834. "The record must support actual partiality of the body or its individual members." Megill v. Board of Regents, 541 F.2d 1073, 1079 (5th Cir.1976). Appellants here have only speculated that because the justice in question advised some classmates how to report suspected violations of the code and because some of those people later testified against appellants at the June 12 hearing, that he was unable to perform as an impartial justice and that his presence infected the board's deliberations with unconstitutional bias. We agree with the district court that just "any prior knowledge of the incident" does not disqualify a decisionmaker; neither this student justice's knowledge of the suspicions about appellants nor his contact with potential witnesses appear to have rendered him a biased decisionmaker or to have denied appellants a tribunal free of bias.
 
 4. The appeal
 
 75
 In its role as an advisory, reviewing body, to report its recommendation to the dean, the faculty Committee on Admissions and Standards listened to the tape of the hearing before the student board, received written and oral statements from appellants, and questioned appellants before it deliberated the merits of their case to make its independent judgment about the recommendation of the board. However, appellants argue that their case was given only "perfunctory, fleeting review" by the dean of the school and the president of the university, both accepting the recommendations of the board and the committee, in violation of appellants' constitutional right to a meaningful appeal. We do not agree.
 
 
 76
 The possibility that an erroneous decision may have been made by the board was diminished by the extensive review by the faculty committee. To impose two additional layers of de novo review, as appellants seem to request, would not have changed the nature of their opportunity to respond to the charge against them. It is evident that appellants had a full and fair opportunity to present their case to two adjudicative bodies, the independent recommendations of those bodies, one affirming the other, were transmitted to the dean and to the president. These procedures that were afforded appellants conform to the requirements of the "rudimentary elements of fair play," which we have detailed above and which we explained in Dixon. 294 F.2d at 159. We agree with the district court that there was no constitutional infirmity in the intra-university appeal of appellants' suspension.
 
 5. The combination of violations
 
 77
 The Student Code of Professional Ethics at Auburn University School of Veterinary Medicine provides rudimentary protections for students facing suspension on a charge of academic dishonesty. As we have explained, where appellants have challenged the adequacy of the notice and hearing provided them, Auburn's procedures met the constitutional minimum, but no more. They were given notice of the specific violation with which they were charged and were allowed an opportunity to respond at a hearing before an impartial tribunal, held within a reasonable time following the notice. Appellants were allowed to speak in their own behalf, to bring witnesses to support their defense, to confront their accusers, and to appeal their adverse decision to a committee of faculty members and then to officials of the school and the university.
 
 
 78
 Appellants charge, however, that the package of procedures afforded them was unfair and produced an unfair result, primarily because two key elements, which would have ensured due process, were missing: notice of the evidence to be presented against them and cross-examination of accusing witnesses. Given the circumstances, we might be tempted to agree. Appellants were hard-working graduate students, beginning the training for their careers. Their interest in continuing their veterinary studies was doubtless great, although it was not detailed in the record, and the risk of an erroneous decision carried a serious sanction, surely not without potential detrimental effect to their future professional educations and work lives.
 
 
 79
 And what of the burden to the university were we to require that it further formalize the disciplinary procedures? To require that the accusing witnesses provide the board and the accused students a summary of the testimony to be presented would not demand great administrative time or cost to the board or the university. Nor would allowing cross-examination directly by the accusing students put burden of any great weight on the university. To allow cross-examination could enhance the mission of the board by ensuring it can make a fully-informed decision on the charge before it. However, we agree with the district court that, in this case, the potential value of the two additional procedures is doubtful. As we have explained above, despite their surprise at the testimony, appellants ably responded to the Buxton analysis and the other testimony against them, never requesting an extension of time or suggesting that they were at a disadvantage by continuing on with the June 12 hearing.
 
 B. The Substantive Due Process Claim
 
 80
 Not only does the due process clause of the Fourteenth Amendment provide procedural protections, it provides a guarantee against arbitrary decisions that would impair appellants' constitutionally protectible interests. As we stated in Dixon, "the governmental power to expel the plaintiffs ... is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement." 294 F.2d at 157. In the context of the termination of the teaching contracts of college instructors, we have required that the decision to terminate the contract be supported by substantial evidence. Holley v. Seminole County School District, 755 F.2d 1492, 1499 (11th Cir.1985); Viverette v. Lurleen B. Wallace State Junior College, 587 F.2d 191, 193 (5th Cir.1979).
 
 
 81
 Appellants argue that substantial evidence must support the board's decision, and was lacking here. The district court refused to articulate the standard required, but found nevertheless that there was substantial evidence of academic dishonesty on the May 16 neuroanatomy exam and that the decision to suspend appellants, based on that evidence, was not arbitrary or violative of their constitutional rights under the Fourteenth Amendment.
 
 
 82
 We agree with the district judge that there was substantial evidence to support the board's conclusion that appellants were guilty of academic dishonesty at the May 16 neuroanatomy examination. The board's decision can be based on the following evidence: the Buxton analysis of the similarity of six of appellants' exam answers; the student's observation of Perry holding up her paper in such a way that Nash could read it, while Nash appeared to be working on the same exam page; the observation by another student who sat behind them that Nash looked on Perry's paper during the exam; and the observation by the professors monitoring the exam that Nash sat in a suspicious posture which would enable him to glance on Perry's paper during the exam.
 
 
 83
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable James E. Doyle, Senior U.S. District Judge for the Western District of Wisconsin, sitting by designation
 
 
 [1]
 We have adopted as precedent all decisions of the former Fifth Circuit, decided prior to October 1, 1981. Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir.1981) (en banc)