**J.S., a minor, by his mother and next friend, Sharon DUCK, Plaintiff,**

v.

**ISLE OF WIGHT COUNTY SCHOOL BOARD, et al., Defendants.**

No. 2:05 CV 76.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 25, 2005.

John W. Hart, Esquire, Virginia Beach, VA, Counsel for Plaintiff.

Kevin J. Cosgrove, Esquire, James R. Theuer, Esquire, Hunton & Williams, Richmond, VA, Counsel for Defendants.

## *OPINION*

REBECCA BEACH SMITH, District Judge.

This case is before the court on plaintiff's Motion for Issuance of a Preliminary Injunction. Because plaintiff has not

made a strong showing of irreparable harm, nor demonstrated a likelihood of success on the merits, the motion is **DENIED**.

### I. Factual and Procedural History

On February 7, 2005, plaintiff J.S., a minor, filed a complaint through his mother and next friend Sharon Duck ("Duck"), alleging under 42 U.S.C. § 1983 that defendants violated J.S.'s constitutional rights by suspending him and transferring him to an alternative high school without affording him due process. The complaint also alleges that defendants violated a previous court order and retaliated against J.S. for exercising his civil rights. On February 18, 2005, plaintiff filed a motion for a preliminary injunction, asking that J.S. be readmitted to Windsor High School ("WHS") during the pendency of this litigation. Defendants responded on March 7, 2005, and a hearing was held on March 11, 2005.

Up until January 6, 2005, J.S. was a student in the ninth grade at WHS. Compl. at ¶ 10. J.S. is learning disabled and had an Individualized Education Plan ("IEP") in place. *Id.* at ¶ 27. On December 7, 2004, J.S. allegedly engaged in inappropriate activity in unauthorized areas at WHS after school hours during a choral performance of the Windsor Middle School. A surveillance camera captured J.S. entering a girls' bathroom with a female student[1] ("Jane Doe") and emerging three to four minutes later. Duck Aff. at ¶ 5b. On December 10, 2004, Jane Doe reported to William Owen ("Owen"), the principal of WHS, that she had been sexually assaulted by J.S. Owen Decl. at ¶ 2. Owen called the WHS Resource Officer, Deputy Sheriff Gwaltney, who then referred the matter to

Ann House ("House"), assistant principal of WHS. Defs.' Mem. at 3. House investigated the incident and notified Duck of Jane Doe's allegation. *Id.* J.S. submitted and signed a written statement, dated December 13, 2004, describing his version of the incident. *See* Reese Decl. Ex. A.

Following House's investigation, J.S. was suspended from WHS for a period of five school days, beginning December 14, 2004, and ending January 4, 2005. Compl. at ¶ 13. Duck received written notice of the suspension on or about January 3, 2005. Compl Ex. B. Duck was informed in that letter that an administrative hearing must be held before J.S. could be readmitted to school. *Id.*

On January 4, 2005, J.S., Duck, House, and defendant Ron Reese ("Reese"), the Director of Student Services for the Isle of Wight County Public Schools, met for an "administrative review." According to plaintiff, nothing was discussed at that meeting regarding extending J.S.'s suspension beyond the five days already imposed. Compl. at ¶ 18. On the same day as the administrative review, Jane Doe submitted a written statement in the presence of her parents and Mr. Reese. Reese Decl. Ex. A. This statement contains explicit allegations of sexual activity occurring between J.S. and Jane Doe in the girls' bathroom. J.S. contends that this statement was never made available to him, nor were its contents ever summarized for his benefit. Compl. at ¶¶ 24–25.

On January 6, 2005, Reese informed Duck by letter that he decided to "long-term" J.S.'s suspension, effective January 4, 2005, for the remainder of the first semester of the school year, and that J.S. would be reassigned to New Directions

---

1. The girl involved in the incident is a seventh-grade middle school student. Defs.' Mem. at 2.

Alternative School ("Alternative School") for the second semester of the school year. Compl. at ¶ 19, Ex. C. According to defendants, Reese determined at the administrative hearing that House had wrongly categorized the incident as "sexual harassment," and that instead it should be characterized as "disruptive behavior." Defs.' Mem. at 3. The offense of "disruptive behavior" warrants greater disciplinary action under the school's code of conduct. Id.[2] Accordingly, Reese increased J.S.'s punishment. Defendants note that Reese was acting within his authority to increase J.S.'s discipline; in fact, had Reese disagreed with House's suspension and referred the matter back to WHS with a recommendation of increased discipline, Owen would have reviewed the action, and Owen states that he would have imposed the same punishment as Reese did. Owen Decl. ¶ 7. Plaintiff argues that Reese's action was in violation of the school's own policy regarding long-term suspension, which requires that a suspension of ten days be imposed before any longer-term suspension. Compl. at ¶¶ 15, 19.

Duck appealed Reese's decision to the Isle of Wight School Board Disciplinary Committee ("Disciplinary Committee"), and a hearing was held on January 24, 2005, at which J.S. was present and represented by counsel. Plaintiff points to two specific violations of his due process rights that occurred at the hearing. First, plaintiff offered the hallway surveillance videotape as evidence. The Disciplinary Committee did not watch the videotape, despite the fact that there was a TV and VCR present in the room. Compl. at ¶ 22. Second, plaintiff claims (as noted above) that he was not given a copy of the statement made by Jane Doe, nor did anyone sum-

marize verbally what she had said. Compl. at ¶ 24–25. It is not disputed that the members of the Disciplinary Committee were given Jane Doe's statement as part of their evidentiary "packets." *See* Pl.'s Ex. 4 (Reese's agenda for Disciplinary Committee hearing). At the hearing, the committee decided unanimously to uphold the long-term suspension. As a result, J.S. has been attending the Alternative School rather than WHS.

## II. Analysis

### A. Standard for Preliminary Injunction

The case of *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977), controls the issuance of preliminary injunctions in the Fourth Circuit. *Blackwelder* sets out four factors that a court should consider in deciding whether to grant a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff, if an injunction is denied; (2) the likelihood of harm to the defendant, if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Id.* at 193–96. The first two factors are the most important. *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991). In balancing the likelihood of irreparable harm to the plaintiff and the likelihood of harm to the defendant, as the balance tips away from the plaintiff, a stronger showing on the merits is required. *Id.*

### B. Blackwelder Factors

### 1. Irreparable Harm

■ Under Fourth Circuit precedent, the plaintiff must first make a strong showing of irreparable harm, and then the

---

**2.** Under the Isle of Wight County Schools Student Handbook, sexual harassment is a ground for suspension of ten days or less, while disruptive behavior is a ground for suspension of more than ten days. *See* Reese Decl. Ex. B.

court proceeds to balance the hardships that would result to both plaintiff and defendant. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir.2002). Defendants argue that plaintiff has not made the required showing on irreparable harm, and therefore the court should not even proceed to the balancing stage. The court agrees that plaintiff has not met his burden under *Blackwelder* of a "strong showing" of irreparable harm.

Plaintiff presented evidence at the hearing, through the testimony of Duck, that the Alternative School is academically inferior to WHS. First, Duck stated that at the Alternative School, students are put into one classroom for each subject; thus, for example, math is taught by one teacher to students from grades nine through twelve. When questioned, Duck was uncertain about the number of students in the classes at the Alternative School, but she stated that it was a higher number than in J.S.'s classes at WHS. Despite the students being grouped together across grade levels, the courses J.S. is taking at the Alternative School are substantially similar, at least in subject matter, to the ones he was enrolled in at WHS. Duck testified that J.S. now takes Algebra, English, Health and Physical Education, and World Geography, the latter of which also serves as his "Resources" class.[3] At WHS, J.S. took Algebra, English, Health and Physical Education, Earth Sciences, and Resources. Thus, the only difference in courses is that J.S. now takes World Geography instead of Earth Sciences, and Resources is part of his World Geography

class. Defendants deny that there is any difference in educational quality between the two institutions. Defs.' Mem. at 4.

Second, Duck testified that the rules of conduct are stricter at the Alternative School, and that this harms J.S. because he is more likely to get in trouble. For instance, Duck testified that the students at the Alternative School must eat lunch alone every day, not speaking to anyone. Duck also testified that J.S. is required to take the bus to school and that he must sit in the front of the bus and not speak to anyone. Also, the students at the Alternative School are expected to adhere to a dress code requiring them to wear collared shirts and belts every day. J.S. has been disciplined for his failure to comply with these regulations: he received an in-school suspension one day for not wearing a belt.

Third, plaintiff argues that J.S. is harmed by not being able to participate in extracurricular activities at WHS. Because he is banned from school property, he cannot play any sports or do any other extracurricular activities until he is readmitted to WHS. The Alternative School has no extracurricular activities of its own. Duck testified that J.S. played junior varsity football at WHS last fall, and that he wants to play football again in the fall of 2005; however, Duck testified that WHS requires that football players also join the track team in the spring to be eligible to play football in the fall. Therefore, because J.S. cannot participate in track this spring, he will not be able to play football next fall, if he is readmitted to WHS.[4]

**3.** "Resources" is, according to Duck, a class where learning-disabled students are assisted with their assignments by a teacher who specializes in teaching students with learning disabilities. Although J.S. does not have a separate Resources class at the Alternative School, his World Geography class is taught

by a teacher experienced with learning disabled students.

**4.** The only evidence before the court on this point is Duck's testimony. There is no evidence of whether a minimum grade point is required to participate in sports at WHS, or of any other requirements to qualify for athletic teams.

Finally, plaintiff contends that he is not getting the special help he needs at the Alternative School to enable him to achieve satisfactory academic performance, given his learning disabilities. Duck testified that J.S. is getting poor grades at the Alternative School, but that he was getting a "C" average at WHS before the suspension.[5] She stated that J.S. has to attend mandatory after-school tutoring because his grades are so poor. Part of the problem, Duck testified, is that J.S.'s time with a teacher specializing in learning disabilities, which apparently is part of his current IEP, occurs while that teacher instructs a class on World Geography. Therefore, although his IEP is technically satisfied, J.S. is not receiving the one-on-one attention that he needs in order to make acceptable grades. Furthermore, to be readmitted to WHS, J.S. must achieve satisfactory grades at the Alternative School to pass through the various "levels" of achievement that are required before a student can leave. Currently, J.S. is not on track to get back into WHS next fall, in part because of his low grades.

The IEP that is currently in place for J.S. at the Alternative School was signed and agreed to by Duck, which she conceded at the hearing. Duck further conceded that she can go back to the school at any time and ask for changes to be made to J.S.'s IEP, and that she has not yet pursued this course of action. The court, therefore, does not consider the contention that J.S. does not have an adequate IEP at the Alternative School to be evidence of irreparable harm. J.S. has other remedies available to modify his IEP, and those should be pursued before a preliminary injunction is granted. Presumably, if changes were made to J.S.'s IEP, he could receive more one-on-one time with teachers or tutors, and his grades would improve as a result. The fact that J.S. is not making passing grades at the Alternative School does not, in and of itself, amount to irreparable harm.

In sum, plaintiff argues that because the Alternative School is academically inferior and imposes unwanted disciplinary requirements on him, he is irreparably harmed by having to attend through the semester. Plaintiff points out that any trial in this case would likely not take place before the school year ends; thus the harm he is subjected to by having to attend the Alternative School cannot be redressed at trial. The court does not consider any of the factors brought up by plaintiff to amount to a strong showing of irreparable harm, even all together. First, the additional disciplinary rules at the Alternative School may make J.S.'s life slightly less pleasant, but having to wear a belt every day and sit at the front of a bus does not amount to irreparable harm. Second, although Duck's testimony regarding the academic environment at the Alternative School suggested that it may be a less-than-perfect learning environment for a child with learning disabilities, Duck should pursue the appropriate remedies for modifying J.S.'s IEP to attempt to get him more one-on-one time with his teachers. Finally, J.S.'s inability to participate in extracurricular activities may be harmful to him, but not irreparably so. Once he is allowed to return to WHS, he will again be eligible for football and other sports, if not next year then the year after. It currently appears that J.S. needs to spend his extra time concentrating on his academic performance, so that he can return to WHS and play sports. Thus, plaintiff has not made a "strong showing"

---

**5.** Defendants disagree that J.S. was making satisfactory grades at WHS, and cross-examined Duck in this regard at the preliminary injunction hearing.

of irreparable harm under *Blackwelder* and other Fourth Circuit cases.

### 2. Balancing the Hardships

■ Defendants contend that they will be harmed in a few different ways, if an injunction is granted. First, they claim that an injunction will be disruptive to the educational process, namely to teachers and students both at WHS and at the Alternative School, because J.S. will have to be moved out of his current classes and assimilated back into his old ones after several months of being away from WHS.[6] Defendants further claim they would be harmed in a more general sense if the court inserted itself at this juncture into this school disciplinary issue, because the insertion would set the stage for more such actions in the future, thereby not only disrupting the educational process but also impeding the ability of school administrators to make appropriate and timely educational and disciplinary decisions.

In balancing the hardships, the court finds that each side presents some legitimate reasons why it will be harmed if the court either grants or denies an injunction. However, as the balance of harm tips away from the plaintiff, a stronger showing on the merits is required. *Rum Creek Coal Sales, Inc.*, 926 F.2d at 359. In this case, plaintiff has not made a strong showing of irreparable harm. *See supra* § II.B.1. Therefore, the court will proceed to the third *Blackwelder* factor, the likelihood that plaintiff will succeed on the merits.

### 3. Plaintiff's Likelihood of Success on the Merits

Under *Blackwelder*, the probability of success on the merits only becomes an important factor after the balancing of hardships starts to tip against the plaintiff.

However, some judges and commentators have criticized this approach, arguing that it is inconsistent with Supreme Court precedent. *See, e.g., Safety–Kleen, Inc. v. Wyche*, 274 F.3d 846, 868 (4th Cir.2001) (Luttig, J., concurring)(arguing that *Blackwelder* conflicts with Supreme Court precedent by practically eliminating the inquiry into the merits). In any case, the parties addressed the merits both in their memoranda and at the preliminary injunction hearing. Given plaintiff's less than strong showing of irreparable harm, the court has considered the merits at this preliminary stage, and finds that they weigh more in favor of defendants than plaintiff.

The case of *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), governs the due process rights of students facing short-term suspensions. In that case, the Court said that due process requires, at a minimum, that students receive oral and written notice of the charges against them, an explanation of the evidence the authorities have, and an opportunity to present their side of the story. *Id.* at 581, 95 S.Ct. 729. The holding in *Goss* applies in the context of short-term suspensions of ten days or less. *Id.* at 576, 95 S.Ct. 729. The Court specifically states that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584, 95 S.Ct. 729.

■ There is no Supreme Court case dealing with the due process rights of students facing long-term suspensions or expulsion, but a Fifth Circuit case, which was not overruled by *Goss*, considered the due process rights of students facing expulsion. In *Dixon v. Alabama Bd. of Educ.*, 294 F.2d 150 (5th Cir.1961), the Fifth Circuit

---

**6.** The court notes that this disruption to the educational process may also be detrimental to J.S., who is having difficulty achieving satisfactory grades as it is.

held that in order to provide the "rudimentary elements of fair play," a school must meet four requirements before expelling a student: (1) the student must receive notice of the charges against him; (2) there must be a hearing, at which the student may present a defense and testimony or statements of witnesses on his behalf; (3) the student should be given the names of witnesses against him and a summary of the testimony each is expected to give; (4) if the hearing is not before the body that will make the ultimate disciplinary decision, then the hearing body should file a written report of its findings and make the report available to the student. *Id.* at 158–59; *see also Sohmer v. Kinnard, et al.*, 535 F.Supp. 50, 53 (D.Md.1982).

Plaintiff does not dispute that he received notice of the charges against him, that he was given a hearing (in fact, multiple hearings) at which he was able to present a defense, that he knew the name of the witness against him, and that the hearing was before the body that made the ultimate disciplinary decision. Plaintiff's specific contentions are that J.S.'s due process rights were violated by (1) the Disciplinary Committee's refusal to watch the videotape submitted as evidence by J.S. in his defense, (2) the Disciplinary Committee's refusal to allow J.S. to review Jane Doe's statement or to give him a verbal summary of that statement, and (3) the school board's failure to follow its own regulations, as well as Virginia law, in disciplining J.S.

■ The Disciplinary Committee's refusal to watch the videotape is not a due process violation. J.S. was given multiple hearings, and at each hearing he was given the opportunity to tell his side of the story. There is nothing in *Dixon*, *Goss*, or any other applicable case that requires a school board or disciplinary committee to consider every single piece of evidence offered by a student; rather, those cases require that a student be given the opportunity to present evidence and make a case for himself. If the Disciplinary Committee felt that the videotape submitted by J.S. was irrelevant or unhelpful to their decision-making process, they need not have considered it.[7]

■ Plaintiff's second contention, that he never received a summary of Jane Doe's statement, is more problematic, but still likely to fail. Under *Goss*, J.S. has, at a minimum, a right to an "explanation of the evidence the authorities have" against him. Even more process may be required

7. In fact, after viewing the videotape at the hearing on March 11, 2005, the court does not find it particularly relevant. The videotape shows only what went on between J.S. and Jane Doe *outside* of the bathroom, whereas the activity that constitutes the heart of the allegations against J.S. occurred *inside* the girls' bathroom. Plaintiff argues that the videotape convinced one school administrator, House, to give J.S. only five days suspension. The court did not hear any testimony or have any affidavit from House and would only be speculating as to the effect of the videotape on her decision. In any event, even if the videotape had an effect on House's decision, that fact does not make the videotape required viewing for the Disciplinary Committee, which was reviewing the decision of Reese.

Moreover, in the court's opinion, it is quite possible to draw inferences from the videotape that support Jane Doe's version of events. Specifically, the court observed J.S. and Jane Doe for some time walking and talking together in the school's hallways. Then, Jane Doe entered the girls' bathroom and J.S. followed her there. After spending three or four minutes in the girls' bathroom together, Jane Doe emerged and quickly darted down an adjacent hallway. J.S. left shortly after her, but walked in the opposite direction. Their evident desire to part ways quickly could arguably support Jane Doe's contention that something illicit occurred in the bathroom, rather than J.S.'s contention that nothing took place. *See infra* note 8.

in cases of long-term suspensions, as *Goss* holds. 419 U.S. at 584, 95 S.Ct. 729. The general consensus among courts, however, is that there is no due process right to cross-examine witnesses or to examine the actual statements made by witnesses. *See, e.g., Nash v. Auburn University,* 812 F.2d 655 (11th Cir.1987) (holding that a student has no due process right to cross-examine witnesses in a disciplinary hearing); *Tun v. Fort Wayne Cmty. Sch.,* 326 F.Supp.2d 932, 944 (N.D.Ind.2004) (holding that school's refusal to allow student facing expulsion to view witnesses' written statements or to confront witnesses did not violate due process); *Craig v. Selma City Sch. Bd.,* 801 F.Supp. 585, 593 (S.D.Ala. 1992) (stating that a student does not have a federal right to obtain materials to prepare for cross-examination of witnesses, because there is no right to cross-examine witnesses). However, under *Dixon* and other cases, students do have a due process right to receive a summary of witness statements if they were made outside of the presence of the accused. *Nash,* 812 F.2d at 663; *Dixon,* 294 F.2d at 155, 159.

While J.S. did not receive a summary of the statement made by Jane Doe, this alone is not likely to rise to the level of violation of a constitutional right. First, *Dixon* involved an expulsion hearing rather than a long-term suspension; thus, arguably, the requirements of *Dixon* need not be strictly adhered to in suspension hearings. Most importantly, it is widely accepted that the sufficiency of procedures provided to students being disciplined depends on the circumstances at hand. *Nash,* 812 F.2d at 663–64; *Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077 (5th Cir.1984).

Considering the totality of the circumstances surrounding J.S.'s suspension, whether he had a constitutional right to more specific notice of his accuser's statement is questionable at best. J.S. and Duck were informed, via Reese's letter dated January 6, 2005, that there were allegations of "sexual activity" made by Jane Doe. Pl.'s Ex. 2. It is unlikely that due process requires more of an explanation of the evidence against J.S. than that. Primarily, the court finds it doubtful that a more detailed description of Jane Doe's allegations would have enabled J.S. to defend himself better at the hearing before the Disciplinary Committee. Jane Doe's statement consists of a description of events that she claims took place in the girls' bathroom the night of December 7, 2004, at WHS. J.S. also gave an account of what he contends took place in the bathroom that night, and that account differs from Jane Doe's. It is not clear how the more detailed allegations made in Jane Doe's statement would have assisted J.S. in considering what evidence to present before the Disciplinary Committee. J.S. already knew what occurred in the girls' bathroom and that he was defending himself against allegations of sexual activity; thus, any evidence he had to rebut Jane Doe's assertion that sexual activity took place should have been introduced by him at the hearing, and apparently it was.[8] Therefore, given the totality of the circumstances surrounding J.S.'s disciplinary hearing, it appears that he was, in fact, afforded due process.

■ Finally, plaintiff claims that defendants violated the school's own policy, as well as Virginia law, in transferring him to the Alternative School before he had been

---

**8.** Basically, this was a "he said, she said" situation, and the decision-maker believed Jane Doe's story over J.S.'s. According to J.S.'s written statement dated December 14, 2004, all that happened in the bathroom is that Jane Doe washed her face while he stood there. Reese Decl. Ex. A.

given a ten-day suspension. Compl. at ¶ 38. Plaintiff cites from the Isle of Wight County Schools Student Handbook ("Student Handbook"):

> A suspension in excess of ten school days is made by the superintendent or designee after the principal suspends a student for ten school days and recommends either an assignment to the alternative school or a suspension for a specific number of days beyond ten school days.

Student Handbook at 29 (attached to Reese Decl. as Ex. C). According to plaintiff, this provision means that J.S. could not be sent to the Alternative School, until he had already been given a ten-day suspension *and* a recommendation to be assigned to the Alternative School. Since his initial punishment, meted out by House, was only a five-day suspension, it was technically against school policy for Reese to suspend him for more than ten days.

Whether school policy was followed to the letter is not relevant to the due process issue. "When the minimal due process requirements of notice and hearing have been met, a claim that an agency's policies or regulations have not been adhered to does not sustain an action for redress of procedural due process violations." *Goodrich v. Newport News Sch. Bd.*, 743 F.2d 225, 227 (4th Cir.1984) (citing *Atencio v. Bd. of Educ.*, 658 F.2d 774

(10th Cir.1981)). "In other words, 'the fourteenth amendment does not require a local school board to adhere to its own guidelines as long as minimum due process is accorded.'" *Echtenkamp v. Loudoun Cty. Pub. Schs.*, 263 F.Supp.2d 1043, 1055 (E.D.Va.2003)(quoting *Goodrich*, 743 F.2d at 226–27). While these cases involve the discharge of teachers or other school employees, rather than the suspension or expulsion of students, the same principle applies to the case at bar: violation of a school's policy is not prima facie evidence of a constitutional due process violation.[9]

Similarly, violation of a state law, in and of itself, does not implicate constitutional due process concerns. *See, e.g., Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir.1990); *Jones v. City and County of Denver*, 854 F.2d 1206, 1209 (10th Cir.1988). Plaintiff claims that defendants violated two Virginia Code sections, Virginia Code §§ 22.1–277.04 and 22.1–277.05. Pl.'s Mem. at 6–7. Section 22.1–277.04 sets forth a procedure for short-term suspensions, which clearly does not apply to this case. Section 22.1–277.05, which covers long-term suspensions, states that a pupil can be suspended for more than ten days in accordance with the regulations of the school board. Thus, to the extent the school board did not comply with its own regulations in suspending J.S., plaintiff argues it was in violation of state law.

---

**9.** Some courts considering this issue have held that a due process violation existed where a school failed to follow its own regulations in disciplining a student. *See, e.g., Killion v. Franklin Reg'l Sch. Dist.*, 136 F.Supp.2d 446, 451 (W.D.Pa.2001) (finding a due process violation where school violated the Pennsylvania School Code by not providing written notification to the student of the charges against him before a hearing was held); *Huebner v. Bd. of Educ. of Township High Sch. Dist. 211*, 1997 U.S. Dist. LEXIS 3568, *15 (N.D.Ill.1997) (school board's fail-

ure to follow procedural safeguards set forth by Illinois law violated plaintiff's due process rights); *Darby v. Schoo*, 544 F.Supp. 428 (W.D.Mich.1982) (finding a due process violation in school's failure to abide by school board policy regarding hearings). The court views these cases as distinguishable from the case at bar, because here the departure from the established policy was not particularly egregious, and according to defendant the same result would have been reached if the policy had been followed.

Because neither a violation of state law nor a violation of school board policy in and of itself constitutes evidence of a constitutional due process violation, plaintiff cannot win on the merits with this claim. In any event, even had established policies been followed, defendants claim that the same result would have been reached regarding the long-term suspension of J.S.: Owen, the principal of WHS, states that he would have imposed the same punishment (long-term suspension and transfer to the Alternative School) as Reese did, had Reese disapproved the original five-day suspension and returned the matter to Owen for a recommendation. Owen Decl. ¶ 7.

As these are the only arguments put forth by plaintiff, he is unlikely to succeed on the merits. First, there appears to be no due process violation on the grounds alleged. Second, applying the three-factor balancing test for procedural due process claims set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), likewise does not help plaintiff.[10] The *Mathews* factors are: (1) the private interest that is affected by the official action; (2) the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burden that the additional or substitute procedural requirements would entail. *Id.* at 334–35, 96 S.Ct. 893.

Although a student's interest in a free public education has been deemed extremely important by courts, *see Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920 (6th Cir.1988), here J.S. is receiving a free education: it is merely at a different school. Plaintiff has submitted no evidence, other than the testimony of Duck,

that the Alternative School is inferior to WHS. Moreover, the probable value of imposing any additional or substitute safeguards onto the school's policy for dealing with suspensions is minimal. J.S. received three opportunities to present his case, including a hearing at which he was represented by counsel. The fact that he was unable to convince the decision-makers of his innocence does not warrant the imposition of additional procedural safeguards. Finally, the school board's interest in not being required to impose greater procedural safeguards is high: as evidenced by this case, a single student in disciplinary trouble can impose great burdens on school administrators at all levels. Therefore, plaintiff has not established a likelihood of success on the merits under *Mathews* and *Goss*.

### 4. The Public Interest

Because the court determines that plaintiff has not met his burden of a strong showing of irreparable harm, nor has he shown a likelihood of success on the merits, the court need not consider the fourth and final *Blackwelder* factor. However, the court notes that the inquiry into the public interest is clearly connected to the other *Blackwelder* factors: if plaintiff had shown irreparable harm and a likelihood of success on the merits, it would be in the public interest for the court to grant the injunction. Since plaintiff has not made these showings, issuance of an injunction is not in the public interest, as said injunction would be disruptive to the educational process and the public school system in general.

### III. Conclusion

Plaintiff has failed to make a strong showing of irreparable harm, as *Black-*

---

**10.** Although *Goss* was decided a year before *Mathews,* it was not overruled by the later case. *Mathews* provides a general balancing test to be used in any procedural due process case, whereas *Goss* applies specifically in the context of school disciplinary hearings.

*welder* requires. Although the court need not move past the first *Blackwelder* factor, *see Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 271 (4th Cir.2002), the court has considered the merits and finds them to favor the defendants. Therefore, plaintiff's motion for a preliminary injunction is **DENIED.** The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for all parties.

**IT IS SO ORDERED.**