PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

FAIRFAX COUNTY SCHOOL BOARD

v.  Record No. 180497

S.C., BY HER NEXT FRIEND, FAREN COLE

OPINION BY
JUSTICE D. ARTHUR KELSEY
MAY 30, 2019

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

The Fairfax County School Board disciplined S.C., a high-school student, for nonconsensual, sexual touching of three students at school. S.C. appealed to the circuit court and sought a judicial vacatur of the School Board's decision. Finding that the School Board's decision was arbitrary in violation of S.C.'s due process rights, the circuit court dismissed the disciplinary proceedings against S.C. with prejudice. The School Board appeals, arguing that the circuit court misapplied the governing legal standards and misinterpreted the factual record of the disciplinary proceedings. We agree and reverse.

I.

Code § 22.1-87 authorizes petitions for judicial review of school board actions. The circuit court sits as an appellate tribunal when hearing these petitions and may consider the school board's orders, the hearing transcript, "and any other evidence found relevant to the issues on appeal by the court." Code § 22.1-87. In this case, the parties did not offer any evidence outside of the administrative record, and thus, our review, as well as the circuit court's, is limited to that record.[1] Because we, like the circuit court, independently review the record from the

_____

[1] By its order, the circuit court has sealed portions of the administrative disciplinary record, and accordingly, we have sealed one of the two joint appendices filed in this appeal. To the extent that we mention facts found only in the sealed record, we unseal only those specific

perspective of an appellate court, we give no deference to the circuit court's recitation of the facts or to its interpretation of the inferences arising from the underlying record.[2]

A.

In 2016, S.C. began her freshman year at a high school in Fairfax County. At that time, one of S.C.'s parents received a copy of the school's policy entitled "Student Rights and Responsibilities: A Guide for Families" (the "SR&R"). 2 J.A. at 318. This policy addressed "Acts for Which Students May Be Disciplined." *Id.* at 382. Those acts included "any behavior incompatible with a K-12 educational environment and good citizenship." *Id.* at 383. The policy then identified specific "examples of prohibited conduct" after twice clarifying that these were mere examples. *Id.*

In pertinent part, the SR&R stated that "[a]cts for which students may be disciplined include, but are not limited to . . . [a]ssault." *Id.* Under the category of "[a]ssault," a list of various prohibited acts appeared, including "[i]mproper touching of another person (whether or not consensual)" as well as "[s]exual assault or battery upon any person." *Id.* at 384; *see id.* at 355 (listing "Improper Touching and/or Sexual Activity" as an "Offense and/or Violation"). The school tests the students at the beginning of each school year to measure their understanding of the SR&R. In September 2016, S.C. answered "T" for "True" to a test question asking whether "[a] student who touches another student intentionally in his or her private areas will face disciplinary action and may be reported to the police." *Id.* at 319-21.

---

facts, finding them relevant to our decision. The remainder of the previously sealed record remains sealed.

[2] We also may take judicial notice of "any book, record, register, journal, or other official document or publication purporting to contain, state, or explain [the] law" of the Commonwealth or its political subdivisions or agencies, Code § 8.01-386; Rule 2:202, as well as "all official publications of this Commonwealth and its political subdivisions and agencies required to be published pursuant to the laws thereof," Code § 8.01-388; Rule 2:203.

2

On February 22, 2017, three female students reported to a school counselor that S.C. had touched them in a sexually inappropriate manner. In detailed, written statements and in oral statements to the assistant principal, the students alleged that the sexual touching was intentional on S.C.'s part and nonconsensual on their part. One of three students stated that she was "being sexually harassed" and that she felt "a bit unsafe" and "uncomfortable" seeing S.C. in the hallways at school. *Id.* at 294, 299. A second student felt not only "uncomfortable" but also "anxious" around S.C. *Id.* at 301. The third student was "extremely nervous" seeing S.C. at school because "if she gets mad it's bad. She has others gang up on people." *Id.* at 295, 300. Even though S.C. "knows not to confront me," this student worried, "if she confronts others they don't have [the] capability to defend themselves verbally or physically that I can." *Id.* at 300.

The school administration responded promptly. On February 23, the assistant principal informed S.C. of the "suspected infraction" and explained "the facts known to school personnel," *id.* at 542, who had interviewed the three alleged victims. *See id.* at 288. On that same day, S.C. provided the school with a written statement in response to the allegations. In it, S.C. admitted to touching students while at school but claimed that the touching was consensual, adding that "[t]hese people are really good and close friends of mine." *Id.* at 293.

Later on that day, the principal suspended S.C. for 10 days. The principal also referred the matter to the division superintendent's hearing officer for a disciplinary hearing to determine "whether [S.C.] should be long-term suspended, reassigned to an alternative educational setting, or recommended to the School Board for expulsion." *Id.* at 541; *see also id.* at 546.[3] The

---

[3] Code §§ 22.1-277.05(A) and 22.1-277.2:1(B) authorize the adoption of school board regulations that allow the division superintendent to appoint a designee to make disciplinary decisions regarding suspension and attendance in an alternative education program subject to review by the school board.

referral letter stated that the referral was "necessary because [S.C.] was involved in a sexual assault against another student." *Id.* at 541. On the same day, the principal informed S.C.'s parents — both orally and in writing — that the reason for the suspension and referral was that S.C. had "engaged in the sexual battery of other students while on school grounds." *Id.* at 542.

The principal's letter also informed S.C. that, upon request, S.C. could obtain "a redacted copy of the discipline packet that is submitted in support of the disciplinary referral." *Id.* at 543. That packet included written victim-impact statements by the accusing students. *See* R. at 757, 763. Before the disciplinary hearing, S.C. and her parents obtained the "discipline packet," 2 J.A. at 331-32, which informed them of the allegations that would be presented at the hearing.

B.

The Office of the Division Superintendent scheduled the hearing for March 7 (Day 8 of S.C.'s 10-day suspension) but rescheduled it at the request of S.C.'s father for March 9 (Day 10 of the 10-day suspension).[4] Two hearing officers representing the division superintendent presided over S.C.'s disciplinary hearing. S.C. appeared at the hearing represented by legal counsel. A court reporter transcribed the proceedings. Before the hearing began, S.C. acknowledged that she understood that she was accused of "[s]exual assault against other students." *Id.* at 424.

Early during the hearing, S.C.'s counsel sought to establish that S.C.'s conduct was not "sexual battery," a "criminal charge" with elements defined by statute. *Id.* at 450-52. "I'll be happy to submit the statute," S.C.'s counsel declared, "so that we can all get on the same page as

---

[4] The SR&R defines a "Day" to mean "a school day unless the context requires otherwise," 2 J.A. at 363, 407, and specifically defines a "Short-Term Suspension" as a "[d]isciplinary action that denies school attendance for a period not to exceed ten days," *id.* at 364, 409.

to what battery and sexual battery is because that's what's been alleged here." *Id.* at 452. Counsel returned to this theme later in her appeal to the School Board by adding that "Section 18.2-67.4 of the Code of Virginia defines 'sexual battery'" as sexual abuse that is "against the will of the complaining witness, by force, threat, intimidation, or ruse." 2 J.A. at 564.

In her testimony at the disciplinary hearing, S.C. stated that the allegations against her were only "somewhat accurate." *Id.* at 486. Among her qualifications, S.C. indicated that she had touched one student's vagina once, not twice as the student had alleged, and that she had done this only after the student had agreed to the touching by saying, "yes, I would let anyone touch me there." *Id.* In response to her counsel's immediate request for clarification, S.C. testified that she had only touched the student's "inner thigh." *Id.* at 487. S.C. also testified that one of the other accusers had asked to be touched "under the shirt" and that while doing so S.C. "accidentally" had touched the student's breast. *See id.*

S.C. did not equivocate, however, regarding the prohibition in the school's disciplinary policy. When asked whether "school rules allow[ed] [her] to touch anyone in a sexual manner," S.C. admitted, "No." *Id.* at 490-91. She then admitted, without qualification, that she had violated this disciplinary policy:

| | |
|---|---|
| [Hearing Officer]: | Did you touch someone in a sexual manner on school grounds? |
| [S.C.'s Counsel]: | When you say a sexual manner, what do you mean? |
| [Hearing Officer]: | Breasts, vaginal area, buttocks. |
| [S.C.]: | Yes. |

*Id.* at 491. After this admission, S.C.'s counsel requested that the hearing officers limit S.C.'s discipline to a reassignment to another regular public school. Counsel also conceded that S.C.'s

conduct, even under S.C.'s version of events, could constitute a violation of the SR&R policy:

> I read the Rules and Responsibilities packet, and even though the definition of assault and what is sexual battery is different than what is in the statute, it specifically talks about touching that is consensual or nonconsensual if it's improper. So despite [S.C.'s] intentions and what she said today, there's a very good possibility that this does fall within a disciplinary realm.

*Id.* at 506.

The hearing officers found that S.C. had "committed serious offenses in violation of School Board policy by committing multiple acts of offensive touching of three fellow students." *Id.* at 554. The acts involved "various incidents of sexual touching" that "were not consensual." *Id.* The hearing officers made clear that they did "not believe [S.C.'s] denials." *Id.* Instead, they found that S.C.'s actions had been "willful, deliberate, and far outside the bounds of acceptable student conduct." *Id.*

The hearing officers added that they "were unable to determine . . . whether [S.C.'s] inappropriate touching of students rose to the level of sexual battery." *Id.* The hearing officers' inability to make this determination was irrelevant, however, because they had already found that "'improper touching of another person (whether or not consensual)' is a violation of SR&R," *id.* The discipline for S.C. included reassignment to an alternative learning center, probationary conditions for a minimum of one year, and reassignment to a different, regular high school at the beginning of the 2017-2018 school year if S.C. could complete the year successfully at the alternative learning center and if she could comply with all of the probationary conditions.

Code § 22.1-279.3:1 requires division superintendents statewide annually to report data of certain incidents regarding discipline, crime, or violence to the Virginia Department of Education ("VDOE"). To do this, division superintendents use uniform reporting codes. The hearing officers in S.C.'s case ordered that her "discipline record" be amended by removing any

reference to "battery/assault of student-no injury" and replacing it with the expression "offensive touch-student."  2 J.A. at 554.  A reiteration of the later phrase, "Offensive Touching Against Student," is a generic reporting code "designated by the [VDOE] for school systems to use when reporting a student's 'improper physical contact against [another] student that is offensive, undesirable, and/or unwanted, as determined by the victim.'"  *Id.* at 570 n.2 (second alteration in original) (citation omitted).[5]  The hearing officers' finding that S.C. had sexually touched students without their consent — thus violating the SR&R prohibition against "improper touching of another person (whether or not consensual)," *id.* at 554 — fit within the generic reporting code of "Offensive Touching Against Student" required by the VDOE, R. at 726-27.

C.

After an unsuccessful appeal to the Fairfax County School Board, S.C. filed a petition for judicial review under Code § 22.1-87 in the circuit court.  The court reviewed the record of S.C.'s disciplinary proceedings, received briefs and arguments from counsel, and entered a final order holding that the School Board had acted arbitrarily in disciplining S.C. because its decision had violated S.C.'s constitutional right to due process.

In response to a motion to reconsider by the School Board, the court entered an amended final order amplifying its reasoning and restating that "the disciplinary proceedings against [S.C.] are therefore dismissed with prejudice by this Court."  1 J.A. at 277.[6]  In its amended final order, the circuit court reasoned that:

_____

[5] *See also* 1 J.A. at 99-100; R. at 726-27 (VDOE, Comprehensive User Guide for Discipline, Crime, and Violence (DCV) Data Collection and Submission (rev. 2017)).

[6] Given our holding, we need not address whether the circuit court's dismissal with prejudice of the disciplinary proceedings was a proper remedy for the alleged due process violation.  *See generally United States v. Stoltz*, 720 F.3d 1127, 1133 (9th Cir. 2013) ("Broadly speaking, due process violations are remedied by providing the aggrieved party the process he or she was deprived (or an equivalent)." (citation omitted)); *Huntley v. North Carolina State Bd. of*

7

- Prior to the disciplinary hearing, the school had notified S.C. of the allegations of "sexual battery" made against her by three students. *Id.* at 272 (citation omitted).

- "[I]n seeming contradiction" to that finding, the hearing officers could not determine whether S.C.'s conduct "rose to the level of sexual battery" and directed that the "battery/assault of student-no injury" phrase be removed from S.C.'s disciplinary record. *Id.* at 273 (citation omitted).

- "The effect of [the hearing officers'] ruling was to impose on this Court deference to a finding of fact that no 'assaults' occurred." *Id.*

- After exonerating S.C. of assault or battery, the hearing officers held that S.C. had committed "offensive touch-student." *Id.* at 273-74.

- The SR&R provided "notice to students" that they could be disciplined for "some variant of 'assault' or 'improper touching of another person (whether or not consensual).'" *Id.* But the SR&R did not provide notice to students that they could be disciplined for "offensive touch-student." *Id.* at 274.

- "The main difficulty" identified by the circuit court was that the hearing officers had rejected a holding that S.C. had committed "assaults" yet had held that S.C. had committed "offensive touch-student," an undefined disciplinary offense not found in the SR&R. *Id.*

Based upon this reasoning, the court concluded: "The Court HOLDS . . . that the contradictory findings of fact and resultant disciplinary transgression of 'offensive touch-student' ascribed to S.C. by [the hearing officers], as affirmed by the School Board, are sufficiently dissonant from the process due to constitute arbitrary action" in violation of Code § 22.1-87. 1 J.A. at 276-77. As a remedy, the court thus ordered that S.C.'s disciplinary record "be changed to vacate the finding of 'offensive touch-student.'" *Id.* at 277.

---

*Educ.*, 493 F.2d 1016, 1021 (4th Cir. 1974) (remanding for district court to enter order adjudicating that a school board's decision is of "no effect" and specifying that the court's order is "without prejudice" to the board's right to determine the issue on the merits — this time affording the appellant due process).

8

## II.

On appeal, the School Board finds fault with the circuit court's legal reasoning as well as its interpretation of the factual record of the disciplinary proceedings. We agree with the School Board's argument on several points.

## A.

In Virginia, judicial review of school disciplinary decisions must take into account the unique constitutional status of school boards. The Constitution of Virginia created school boards and vested them with constitutional powers. *Wood ex rel. Wood v. Henry Cty. Pub. Sch.*, 255 Va. 85, 91 (1998); *DeFebio v. County Sch. Bd.*, 199 Va. 511, 513 (1957). Article VIII, Section 7 of the Constitution of Virginia grants school boards the general power of "[t]he supervision of schools." While this provision "does not define the powers and duties involved in that supervision," *DeFebio*, 199 Va. at 513, we have held that certain "decisions regarding the safety and welfare of students are manifestly a part of the supervisory authority granted the school boards under Article VIII," *Commonwealth v. Doe*, 278 Va. 223, 230 (2009).

We have gone even further and observed that, given the constitutional status of school boards, "[n]o statutory enactment can permissibly take away from a local school board its fundamental power to supervise its school system." *Russell Cty. Sch. Bd. v. Anderson*, 238 Va. 372, 383 (1989). A well-deserved measure of deference, therefore, must be factored into any application of Code § 22.1-87, which authorizes judicial review with the qualification that "[t]he action of the school board shall be sustained unless the school board exceeded its authority, acted arbitrarily or capriciously, or abused its discretion." A school board's actions are "arbitrary and capricious when they are 'willful and unreasonable' and taken 'without consideration or in

9

disregard of facts or law or without determining principle.'" *School Bd. v. Wescott*, 254 Va. 218, 224 (1997) (quoting Black's Law Dictionary 105 (6th ed. 1990)).

B.

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Goss v. Lopez*, 419 U.S. 565, 578 (1975) (citation omitted). Consequently, "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." *New Jersey v. T.L.O.*, 469 U.S. 325, 339-40 (1985).[7]

In this context, "the interpretation and application of the Due Process Clause are intensely practical matters[,] and . . . 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Goss*, 419 U.S. at 578 (alteration and citation omitted). Due process protects "the opportunity to be heard" by requiring, at a minimum, "*some* kind of notice" and "*some* kind of hearing." *Id.* at 579 (emphases in original) (citation omitted); *accord Wood*, 255 Va. at 91. The sufficiency of "the timing and content of the notice . . . will depend on appropriate accommodation of the competing interests involved." *Goss*, 419 U.S. at 579.

Due process in connection with suspending a student from school for "10 days or less" requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his

---

[7] Procedural due process "protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution," *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005), and thus, "[t]he corresponding provisions of the Virginia Constitution go no further than their federal counterparts," *Lilly v. Commonwealth*, 50 Va. App. 173, 184 (2007).

side of the story." *Id.* at 581; *accord Wood*, 255 Va. at 91-92; *cf.* Code § 22.1-277.04 (tracking

closely the *Goss* requirements).[8]  This minimal process does not include "the opportunity to

secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own

witnesses to verify his version of the incident" or any other "truncated trial-type procedures."

*Goss*, 419 U.S. at 583.  "Longer suspensions or expulsions for the remainder of the school term,

or permanently," however, "may require more formal procedures."  *Id.* at 584.

　　The United States Supreme Court has never specifically addressed the amount of process

due, if any, when a student is transferred to another school because of a disciplinary infraction.

In *Goss*, two of the students had received disciplinary transfers.  *See id.* at 569-70 nn. 4-5.

Without comment, the Supreme Court nonetheless calibrated the requisite due process

protections based solely upon the 10-day-or-less suspensions that these students also had

received.  *See id.* at 569-70 nn. 4-5, 581.[9]  Since *Goss*, many lower courts have held that a

---

[8] Typically, in this situation, "[s]ince the hearing may occur almost immediately following the misconduct, it follows that as a general rule notice and hearing should precede removal of the student from school."  *Goss*, 419 U.S. at 582.  That said, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.  In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . ."  *Id.* at 582-83.

[9] *See Wayne v. Shadowen*, 15 Fed. Appx. 271, 290 n.31 (6th Cir. 2001) (interpreting *Goss* to suggest, "by negative implication, that discipline less invasive of the student's state-given property right to an education, than physical suspension from the school, which would bring his consequent extirpation from all of the academy's educational opportunities and options, may not trigger *any* predicate due process requirements" (emphasis in original) (citing *Goss*, 419 U.S. at 580-84)); *Donovan v. Ritchie*, 68 F.3d 14, 18 (1st Cir. 1995) ("But the mere fact that other sanctions are added to a short suspension does not trigger a requirement for a more formal set of procedures.  In *Goss* itself one of the plaintiffs had not only been suspended, but had been transferred to another school."); *Patrick v. Success Acad. Charter Sch., Inc.*, 354 F. Supp. 3d 185, 215 (E.D.N.Y. 2018) (recognizing that some courts "note that in *Goss* itself, although one of the plaintiffs 'had been transferred to another school,' the Supreme Court did not find that he was entitled to any additional procedural due process protections other than those he was given in connection with his short-term suspension, implying that no procedural due process protections are required where the punishment is a transfer" (citation omitted)).

disciplinary transfer to an alternative school does not deprive a student of a property interest in education "absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school," *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) (collecting cases), *superseded by statute on other grounds*, William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457 § 221(2), 122 Stat. 5044, 5067 (codified as amended at 18 U.S.C. § 1595(a) (2008)).[10]

Other courts deem a disciplinary transfer sufficiently punitive to warrant due process protections, without contrasting the education at the transferor and transferee schools. *See, e.g.*, *Everett v. Marcase*, 426 F. Supp. 397, 400-01 (E.D. Pa. 1977) (stating that "[a]ny disruption in a primary or secondary education, whether by suspension or involuntary transfer, is a loss of educational benefits and opportunities" and applying due process procedures under *Goss* because a transfer is "as detrimental to the pupil's interests as a short term suspension"); *D.C. v. School Dist. of Phila.*, 879 A.2d 408, 419 (Pa. Commw. Ct. 2005).

C.

We assume, without deciding, that S.C. had some liberty or property interest implicated by her disciplinary transfer from one school to another. Even if she had such an interest, however, S.C. received all the process she was constitutionally due. The circuit court erred in concluding otherwise.

---

[10] *See, e.g.*, *Zamora v. Pomeroy*, 639 F.2d 662, 669 (10th Cir. 1981); *Patrick*, 354 F. Supp. 3d at 216-18, 247-50 (collecting cases); *Lindsey v. Matayoshi*, 950 F. Supp. 2d 1159, 1169-70 (D. Haw. 2013); *J.K. ex rel. Kaplan v. Minneapolis Pub. Sch.*, 849 F. Supp. 2d 865, 871, 873 (D. Minn. 2011); *J.S. ex rel. Duck v. Isle of Wight Cty. Sch. Bd.*, 362 F. Supp. 2d 675, 685 (E.D. Va. 2005).

1.

In this case, three students provided detailed, written statements to the school administration alleging that S.C. had sexually assaulted them. The school principal promptly suspended S.C. for 10 school days and referred the matter for a hearing. The hearing was initially scheduled for Day 8 of the suspension but was postponed until Day 10 at the request of S.C.'s father. As the circuit court implicitly acknowledged, the 10-day suspension violated no due process principles. Under *Goss*, S.C. received "oral or written notice" of the accusations against her and "an opportunity to present [her] side of the story." 419 U.S. at 581.

Apparently unconcerned about the 10-day suspension, the circuit court focused exclusively on the hearing officers' decision to reassign S.C. to an alternative school and to impose probationary conditions on her readmittance to a regular public school. The court focused its analysis on the specific wording of the principal's letter to S.C. before the hearing (which referred to a "sexual battery" charge) and the referral letter, issued the same day to the division superintendent's hearing officer (which recited a "sexual assault" charge). *See* 1 J.A. at 272-74. These two letters, the court presumed, constituted the only legally relevant notice that S.C. had received.

The court then determined that S.C. was exonerated of these charges because the hearing officers had declined to find that S.C. had committed "sexual battery" and ordered the deletion of any mention of "battery/assault of student-no injury" from S.C.'s disciplinary record. *Id.* at 273-74, 276-77. "The effect of the [hearing officers'] ruling," the circuit court reasoned, "was to impose on [the circuit court] deference to a finding of fact that no 'assaults' occurred." *Id.* at 273. From there, the court observed that the disciplinary infraction that S.C. had allegedly committed — "offensive touch-student" — was not an infraction at all because this term was

13

"neither contained in nor defined by the SR&R." *Id.* at 274. It followed, the court concluded, that "the contradictory findings of fact and resultant disciplinary transgression of 'offensive touch-student' . . . are sufficiently dissonant from the process due to constitute arbitrary action" in violation of Code § 22.1-87. *Id.* at 276-77.

2.

We find the circuit court's factual predicates mistaken and its rationale legally erroneous. Our disagreement begins with the circuit court's view that the hearing officers boxed themselves in by stating that they "were not able to determine" whether S.C.'s nonconsensual sexual touching "rose to the level of sexual battery." *Id.* at 273 (citation omitted). That finding, according to the circuit court, precluded the hearing officers from later finding that S.C. had offensively touched other students because battery (apparently according to its common-law definition) includes nonconsensual, offensive touching. The court's reasoning fails, however, because the hearing officers were not considering common-law battery. They were responding to the *statutory* definition of "sexual battery" that S.C.'s counsel had asserted. *See* 2 *id.* at 450-52. That definition requires a showing that the act was accomplished "by force, threat, intimidation, or ruse," Code § 18.2-67.4, a qualification that the VDOE's statutory policy guidelines recognize.[11]

---

[11] Code § 22.1-279.6(A) requires the Virginia Board of Education to establish guidelines and to develop "model policies for codes of student conduct to aid local school boards in the implementation of such policies." Moreover, Code § 22.1-279.6(B) requires local school boards to adopt "regulations on codes of student conduct that are consistent with, but may be more stringent than, the guidelines of the Board." The Board of Education's "Student Code of Conduct Policy Guidelines" provides: "Definitions of offenses that are also violations of law should be consistent with statutory definitions. When offenses are not defined in the Code of Virginia, definitions developed for the VDOE Annual Discipline, Crime, and Violence Report may be helpful in establishing local operational definitions." Virginia Bd. of Educ., Student Code of Conduct Policy Guidelines 13 (2015) (emphases omitted), http://www.doe.virginia.gov /boe/guidance/safety/student_conduct.pdf. The VDOE's reporting code for "Sexual Battery

14

Thus, for good reason, the hearing officers found it unnecessary to determine whether S.C.'s sexual touching of other students had been accomplished by force, threat, intimidation, or ruse. It was enough that they specifically found that S.C. had sexually touched several students without their consent and that they expressly rejected S.C.'s claims to the contrary. S.C.'s nonconsensual touching, the hearing officers found, had been "willful, deliberate, and far outside the bounds of acceptable student conduct." 2 J.A. at 554. These factual findings fully justified the hearing officers' determination that S.C. had violated the SR&R's express prohibition against "improper touching of another person (whether or not consensual)," *id.*

The circuit court similarly misunderstood the hearing officers' use of the phrase "offensive touch-student." The hearing officers never asserted that this phrase is a specific, verbatim disciplinary infraction in the SR&R. *Compare* 1 *id.* at 273-74, *with* 2 *id.* at 554. Nor did the hearing officers hold, as the court presumed, that S.C. had violated some undefined disciplinary prohibition against "offensive touch-student." *Compare* 1 *id.* at 276, *with* 2 *id.* at 554. Instead, they held that S.C.'s nonconsensual, offensive, and sexual touching had violated the clearly stated SR&R prohibition against "improper touching of another person (whether or not consensual)," 2 *id.* at 554.

As noted earlier, "offensive touch-student" merely referred to a state-wide, uniform *reporting code* used for statistical purposes. *See id.* at 570; *see also* 1 *id.* at 99; R. at 726-27.[12]

_____

Against Student" ("SB2") requires "an offensive or intentional threat, intimidation or ruse or physical helplessness of sexual abuse. Sexual battery is a Class I misdemeanor." VDOE, Discipline, Crime, and Violence Annual Report 71 (2016) [hereinafter 2016 Report], http://www.doe.virginia.gov/statistics_reports/school_climate/discipline_crime_violence/14-15_annual_report.pdf (referencing Code § 18.2-67.4).

[12] Counsel for the School Board pointed out this fact during oral argument before the circuit court:

> [T]he offensive touching [phrase] is not just a term that's made up
> out of thin air. It's actually a term used by the [VDOE]. And one

Code § 22.1-279.3:1 requires all division superintendents in Virginia annually to report data to the VDOE regarding certain incidents of discipline, crime, and violence. The hearing officers' finding that S.C. had sexually touched students without their consent — thus violating the SR&R prohibition against "improper touching of another person (whether or not consensual)," 2 J.A. at 554 — fit within "Offensive Touching Against Student," a generic reporting code required by the VDOE, R. at 726-27.[13] The circuit court erred, therefore, in presuming that the latter, and not the former, was the specific SR&R violation committed by S.C. that the hearing officers had found.

3.

With these factual predicates corrected, we can now answer the question whether the School Board (by affirming the hearing officers' disciplinary decision) acted arbitrarily in violation of S.C.'s procedural due process rights. We see no legal basis for concluding that the School Board did so.

"A school is an academic institution, not a courtroom or administrative hearing room." *Board of Curators v. Horowitz,* 435 U.S. 78, 88 (1978). The proper exercise of judicial review, therefore, recognizes that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures," *T.L.O.*, 469 U.S. at 339-40. Especially in the

---

> of the things the schools have to do, Your Honor, is file periodic reports with the state as to how many disciplinary incidents you had in this or that category . . . . One of those Virginia definitions is called offensive touching against a student.

1 J.A. at 99.

[13] The VDOE's annual reports consistently use the reporting code of "Offensive Sexual Touching Against Student" ("SX2") for this type of incident. VDOE, Discipline, Crime, and Violence Annual Report 4, 8, 15 (2018), http://www.doe.virginia.gov/statistics_reports/school_climate/index.shtml; VDOE, Discipline, Crime, and Violence Annual Report 12, 15, 56, 74 (2017), http://www.doe.virginia.gov/statistics_reports/school_climate/discipline_crime_violence/15-16_annual_report.pdf; 2016 Report, *supra* note 11, at 12, 15, 55, 73; *see also* R. 726-27.

context of school discipline, "the interpretation and application of the Due Process Clause are intensely practical matters," *Goss*, 419 U.S. at 578.

Viewed from this pragmatic perspective, the notice afforded to S.C. was constitutionally sufficient. The circuit court mistakenly treated the principal's referral letter as if it were a criminal indictment. It was not, of course, and did not need to be. The letter simply summarized in a single phrase ("sexual battery") the allegations that S.C. had already been told in detail. The assistant principal orally notified S.C. of "the facts known to school personnel," 2 J.A. at 542, which were later disclosed in detailed, written, victim-impact statements from the students, *see* R. at 757, 763. In response, S.C. provided a detailed, written reply to the allegations. Before the hearing, the school offered to provide S.C. with "a redacted copy of the discipline packet that is submitted in support of the disciplinary referral." 2 J.A. at 330-32, 543. The victim-impact statements were included in the packet. *See* R. at 757, 763.

Due process required the school officials to "inform [S.C.] of [her alleged] dereliction"[14] and to give her a fair opportunity to "tell [her] side of the story in order to make sure that an injustice is not done." *Goss*, 419 U.S. at 580. The assistant principal's oral description of the "facts known to school personnel," 2 J.A. at 542, coupled with the principal's letter and the discipline packet, notified S.C. of the allegations against her.[15] This conclusion is corroborated

[14] *See, e.g.*, *J.S.*, 362 F. Supp. 2d at 683 (concluding that written notice "that there were allegations of 'sexual activity'" was a sufficient "explanation of the evidence" pursuant to due process because "the court finds it doubtful that a more detailed description of [the victim's] allegations would have enabled [the student] to defend himself better at the hearing before the Disciplinary Committee").

[15] *Cf., e.g.*, *Santiago-Lugo v. Warden*, 785 F.3d 467, 475-76 (11th Cir. 2015) (holding, in the context of habeas corpus, that an inmate was not denied due process by a disciplinary hearing officer's finding that he had violated a different rule from the one contained in the notice because the inmate had notice of the "conduct" constituting the basis for his rule violation); *Northern v. Hanks*, 326 F.3d 909, 911 (7th Cir. 2003) (per curiam) ("Because the factual basis of the investigation report gave [the inmate] all the information he needed to defend against the

17

by the fact that S.C.'s counsel never once expressed surprise or claimed to have been misinformed regarding the factual allegations against her.

The circuit court's focus on the phrase "sexual battery" in the principal's letter to S.C. and on the phrase "sexual assault" in the principal's referral letter to the hearing officers presumed that due process principles required the school to itemize disciplinary infractions in granular detail. That has never been the proper standard. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013). *See generally* Emily Suski & Angela Ciolfi, Education Law and Advocacy § 5.202(A), at 22 (8th ed. 2018) (stating that "school board policies . . . may be written in fairly broad terms as long as they give 'adequate warning' that certain conduct may subject a student to sanction" (quoting *Fraser*, 478 U.S. at 686)).

In *Fraser*, for example, the United States Supreme Court held that a student disciplined for violating a school rule that prohibited "obscene" language after he had given a lewd speech could not complain that "he had no way of knowing that the delivery of the speech in question would subject him to disciplinary sanctions." 478 U.S. at 686. This word may have a technical definition in the argot of a criminal code, but it carries a far less precise meaning in the context of a rule of conduct designed for maintaining discipline and order in a school. It was not just

---

trafficking charge, the reviewing authority's modification [from a different charge] did not deprive [the inmate] of his due process rights."); *Holt v. Caspari*, 961 F.2d 1370, 1373 (8th Cir. 1992) (concluding that an inmate was not denied due process by a prison disciplinary committee's finding that he had violated a different rule from the one contained in the notice because an inmate had notice of "the factual charge" constituting the basis for his rule violation).

wrong, the Supreme Court said, but "wholly without merit," *id.*, to believe that due process principles require school disciplinary rules to have the detail of "a criminal code," *id.*

Just as the principal's prehearing notice cannot be treated like an indictment, the school's disciplinary rules cannot be treated like criminal statutes. The SR&R broadly prohibited "any behavior incompatible with a K-12 educational environment and good citizenship." 2 J.A. at 383. The policy then identified "examples of prohibited conduct," stating that acts for which a student might be disciplined "include, but are not limited to" various specific acts. *Id.* Within the broad category entitled "[a]ssault," a list of numerous prohibited acts appeared, including "[i]mproper touching of another person (whether or not consensual)" and "[s]exual assault or battery upon any person." *Id.* at 384. As her own testimony confirmed, S.C. knew of this prohibition before she engaged in her conduct, while she was doing so, and afterwards.

### III.

Applying the "intensely practical" principles of due process applicable to school disciplinary proceedings, *Goss*, 419 U.S. at 578, we find nothing in this record suggesting that the School Board acted arbitrarily in violation of S.C.'s due process rights. Because the circuit court erred in concluding otherwise, we vacate the court's final order and enter final judgment dismissing S.C.'s petition with prejudice.

*Reversed,*
*vacated, and*
*final judgment.*

19